IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

David Yacobucci,

      Plaintiff,

      v.                      Case No. 2:05-cv-989

AT&T Sickness and Accident
Disability Benefit Plan for
Occupational Employees,

      Defendant.

OPINION AND ORDER

This is an action filed by plaintiff David Yacobucci pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq. In a complaint filed in this court on October 28, 2005, plaintiff, an employee of AT&T Corp., brings a claim under 29 U.S.C. §1132(a)(1)(B), challenging the failure of defendant AT&T Sickness and Accident Disability Benefit Plan for Occupational Employees ("the Plan") to pay him short-term disability benefits allegedly due him under the terms of the Plan. This matter is before the court on the parties' respective motions for judgment on the administrative record.

I. Standard of Review

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court held that a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the more deferential arbitrary and capricious standard of review applies. In this case, the Plan provides:

> The BCAC [Benefit Claim and Appeal Committee] shall be the final review committee under the Plan, with the authority to determine conclusively for all parties any and all questions arising from the administration of the Plan, and shall have sole and complete discretionary authority and control to manage the operation and administration of the Plan, including, but not limited to, the determination of all questions relating to eligibility for participation and benefits, interpretation of all Plan provisions, determination of the amount and kind of benefits payable to any participant, lawful spouse or beneficiary, and construction of disputed or doubtful terms. Such decisions shall be conclusive and binding on all parties and not subject to further review.

R. 28, Plan §9.4. The parties agree that the deferential "arbitrary and capricious" standard of review applies in this case.

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir. 2003). Under the arbitrary and capricious standard, a determination by the plan administrator will be upheld if it is rational in light of the plan's provisions. Id.; Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir. 1996). When it is possible to offer a reasoned explanation for a plan administrator's decision based upon the evidence, that decision is not arbitrary and capricious. McDonald, 347 F.3d at 169; Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989). However, a district court's obligation to review the administrative record "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues" to avoid becoming "nothing more than rubber stamps for any plan administrator's decision[.]" McDonald, 347 F.3d at 172.

"Generally, when a plan administrator chooses to rely upon the

2

medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision. <u>McDonald</u>, 347 F.3d at 169. A plan administrator is not required to accord special weight to the opinions of the plaintiff's treating physician, or to offer an explanation when it credits reliable evidence that conflicts with a treating physician's evaluation. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003); <u>Calvert v. Firstar Finance, Inc.</u>, 409 F.3d 286, 293 (6th Cir. 2005)("treating physician rule" does not apply in the ERISA context).

In reviewing the administrator's decision, the court is limited to a consideration of the evidence which was included in the record before the plan administrator. <u>See</u> <u>Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health & Welfare Trust Fund</u>, 203 F.3d 926, 932 (6th Cir. 2000); <u>Smith v. Ameritech</u>, 129 F.3d 857, 863 (6th Cir. 1997).

Plaintiff notes that the Plan is self funded, and that any benefits provided under the Plan are paid directly by AT&T Corp., the Plan Administrator. <u>See</u> R. 10, Plan §3.7; R. 47, Summary Plan Description, p. 8. An employer's operation of a plan both as the insurer and the administrator creates a conflict of interest. <u>Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston</u>, 419 F.3d 501, 506 (6th Cir. 2005); <u>Killian v. Healthsource Provident Adm'rs, Inc.</u>, 152 F.3d 514, 521 (6th Cir. 1998). However, such a situation does not alter the degree of deference granted under the

arbitrary and capricious standard of review; rather, the conflict must be weighed as a factor in determining whether an abuse of discretion occurred.  <u>Kalish</u>, 419 F.3d at 506 (citing <u>Firestone Tire & Rubber Co.</u>, 489 U.S. at 115); <u>Calvert</u>, 409 F.3d at 292-93 (arbitrary and capricious standard remains unchanged, and conflict of interest is considered in applying that standard).

II. <u>Plan Disability Benefits</u>

Under the Plan, qualified participants may receive payments "on account of disability to work by reason of sickness."  R. 9, Plan §3.1.  "Such payments shall terminate when disability ceases and shall in no case extend beyond" the periods specified in §3.2 of the Plan based on the employee's years of service.  <u>Id</u>.  If the employee's Plan credited service is two to five years, disability benefits are paid at full pay rate for four weeks, and half pay for forty-eight weeks.  R. 9, Plan §3.2.  Once they commence, disability benefits continue until the earliest of: (a) the employee no longer follows the requirements of the Plan; (b) the certified disability ceases; (c) the employee's death; (d) termination of the Plan; or (e) the expiration of the applicable benefit period set forth in §3.2.  R. 10, Plan §3.4.

The Plan further provides:

A disabled Employee shall not be entitled to Sickness Disability Benefits ... if he declines to permit the Committee [including the Employee's Benefits Committee and the BCAC] to make or have made by a physician, from time to time, such examinations as the Committee may deem necessary in order to ascertain the Employee's condition, or if he fails to give proper information respecting his condition[.]

R. 17, Plan §5.10.  The Summary Plan Description also advises employees to "[f]urnish information from the physician who is

4

caring for you <u>satisfactory to the Claims Administrator</u>, to certify your disability, including the nature and frequency of your treatment[.]" R. 43.

The Plan also states that the Employees' Benefit Committee, the BCAC, the Claims Administrator (an insurance company authorized by AT&T to provide claims processing administrative services for the Plan), and the Plan Administrator "shall grant or deny claims for Sickness Disability Benefits ... under the Plan with respect to Employees and authorize disbursements according to this Plan." R. 27, Plan §9.2. The Plan provides that if an employee's claim is denied by the Claims Administrator, the employee may file a written appeal to the BCAC. R. 25, Plan §8.2. The employee has the right to "send a written statement of the issues and any other documents in support of the claim for Sickness Disability Benefits[.]" <u>Id</u>. The BCAC serves as the final review committee for the review of all appeals by participants whose claims for sickness disability benefits have been denied by the Claims Administrator. R. 28, Plan §9.3. The BCAC also has the authority to determine conclusively for all parties all questions relating to eligibility for benefits and the amount and kind of benefits payable to any participant. R. 28, Plan §9.4.

<u>III. Plaintiff's Claim</u>

Plaintiff began his employment with AT&T Corp. on August 7, 2000, in Customer Care as a customer service specialist. The position is a sedentary job which requires frequent sitting and standing, requires walking, and pushing and pulling, neck motions, bending and twisting on an occasional basis, and reaching on a seldom basis. Keyboarding and both face-to-face and telephonic

conversation are also required.  R. 72.  Plaintiff's job allows him the flexibility to adjust his positions as necessary, and he has a headset to use while taking phone calls, which allows him the ability to adjust his neck positions as he feels necessary.  R. 460.  Plaintiff was absent from work beginning on March 23, 2004, and he returned to work on April 4, 2005, as a result of a Step 3 grievance settlement.  R. 737.

The administrative record includes medical records from the treatment of plaintiff by several physicians for a variety of health problems.  However, the disability claim at issue in this case relates primarily to two conditions, those being severe fatigue resulting from multiple sclerosis, and chronic neck problems resulting from degeneration of the cervical discs.

Plaintiff was first tentatively diagnosed with multiple sclerosis in 1998.  He is currently being treated for this condition by Dr. Francois Bethoux, a neurologist at the Cleveland Clinic.  Plaintiff's symptoms over the years have included intermittent spasticity and numbness in the hands and feet, arthritic-type symptoms such as pain and stiffness in the joints, and some problems with imbalance while walking, particularly while walking on his toes or in tandem gait.  The records indicate that plaintiff has maintained his lower extremity strength, and that his problems with balance and gait instability have remained at a relatively steady level over the years since the original diagnosis.  Plaintiff has also complained on occasion about extreme fatigue and difficulty sleeping.  Plaintiff has reported that his symptoms tend to worsen in cold weather or in hot and humid conditions.

6

In regard to plaintiff's neck pain, a 1999 MRI of plaintiff's cervical spine showed cervical degenerative disc disease severe at C5-6 and C6-7, with mild cord impingement and bilateral foraminal stenosis, but without any abnormal signal intensity to the cord to suggest that the multiple sclerosis was the cause of these problems. Plaintiff called his general physician, Dr. Ann Koval, on March 23, 2004, to report that he was experiencing severe neck pain. An MRI on March 29, 2004, showed multilevel degenerative disc and facet disease associated with a straightening of the cervical lordosis, including moderate broad-based degenerative disc herniation at C6-7 with minor cord impingement and moderate to severe foraminal stenosis, and small to moderate broad-based degenerative disc herniation at C5-6 with cord contact and moderate to severe left foraminal stenosis and moderate degenerative right foraminal stenosis at C3-4. R. 132. The MRI did not show any abnormal signal intensity to the cord indicative of multiple sclerosis. Dr. Koval declined to complete a disability form for plaintiff, indicating that a specialist should complete the form. R. 215. She referred plaintiff to Dr. Gregory Z. Mavian, an orthopedic surgeon.

Dr. Mavian examined plaintiff on April 20, 2004. Dr. Mavian noted that plaintiff sat comfortably on the exam table without any extreme pain or guarding observed. R. 286. Dr. Mavian observed that the range of motion of plaintiff's cervical spine was significantly impaired on rotation, flexion and extension, and that the restriction was greater than seventy-five percent. He prescribed a course of physical therapy, a muscle relaxant, and ibuprofen. Dr. Mavian saw plaintiff again on May 18, 2004. R.

283.  In a letter to Dr. Koval dated May 18, 2004, Dr. Mavian noted that plaintiff had completed eight physical therapy visits with some improvement, and that plaintiff continued to do exercises at home.  He reported that plaintiff still had ongoing pain and restriction, but that plaintiff sat comfortably and appeared to be without any extreme pain.  Dr. Mavian discussed surgery as an option.  The letter contains no mention of any restrictions on plaintiff's activities or his ability to return to work.  Plaintiff informed MetLife that Dr. Mavian refused to provide certification of his inability to work.  R. 417.

Plaintiff filed a claim for disability benefits on March 31, 2004.  In support of his claim for disability benefits, plaintiff submitted a disability form signed by Dr. Bethoux on April 15, 2004.  R. 121.  This form indicates that plaintiff is able to sit, stand and walk for one hour intermittently, that he can climb steps, twist, bend and stoop, reach above shoulder level, and occasionally lift up to fifty pounds.  On the section of the form which asks why the employee is unable to perform his job duties, Dr. Bethoux stated that plaintiff's disability was due to persistent altered sensations, unpredictable fatigue, and intermittent relapses, and that plaintiff could work less than four hours per day.  R. 122.  Plaintiff also submitted a record from Dr. Bethoux dated April 8, 2004, in which Dr. Bethoux noted that he had reviewed the MRI reports, and that he wanted to see the films prior to plaintiff's next appointment, which at that time was scheduled in August of 2004.  R. 128.  MetLife also received a telephone contact summary from the Cleveland Clinic, which revealed that plaintiff had called on March 8, 2004, complaining of fatigue, that

8

his prescription for Provigil was increased, and that he had
scheduled an appointment with Dr. Bethoux for May 4, 2004. This
summary did not indicate that plaintiff was advised to stop
working. R. 64.

By letter dated April 20, 2004, plaintiff was advised that his
application for disability benefits did not satisfy §5.10 of the
Plan because the documentation submitted did not support the claim
of disability. R. 406. Plaintiff was advised by telephone on
April 22, 2004, that the form provided by Dr. Bethoux did not
adequately document current functional impairments that would
prevent plaintiff from returning to work because Dr. Bethoux had
not seen plaintiff since August 26, 2003. R. 62. Plaintiff was
advised by telephone on April 26, 2004, that the summary received
from the Cleveland Clinic did not show that he was unable to work,
and that any additional medical evidence must be received by May 3,
2004. R. 64. On May 3, 2004, MetLife received a letter from
plaintiff's counsel stating that counsel had been retained to
assist plaintiff with his disability claim. R. 64.

Dr. Bethoux examined plaintiff on May 4, 2004. R. 193-94.
According to Dr. Bethoux's notes, plaintiff reported "no
significant change in symptoms since his last visit. He continues
to complain of neck pain and severe fatigue. He is taking muscle
relaxants for his neck, and has been doing physical therapy for 1
week, with some benefit." R. 193. Dr. Bethoux also noted that
plaintiff "plans to return to work next week" and that he had been
sleeping better since taking muscle relaxants. R. 193. He wrote
that plaintiff's neck pain was constant, but that it improves with
exercise. Dr. Bethoux reviewed the MRI performed on March 29,

9

2004, and noted that it showed structural changes in the cervical spine with straightening of the physiologic cervical lordosis and several bulging discs but no significant cord compression, and no spinal cord lesions or atrophy. Dr. Bethoux also observed that plaintiff's gait was normal, that he was able to walk on his toes and heels, and that his tandem walk was unsteady but that he did not require support for safe ambulation. R. 194. He concluded that the examination was "stable overall" and that the structural changes of the spine explained plaintiff's neck pain, but that there was no cord compression. R. 194. He recommended increasing the dosage of Provigil to address plaintiff's severe fatigue.

By letter dated May 5, 2004, plaintiff's counsel was advised that plaintiff's claim for disability benefits had been denied. The letter stated that no medical information was received from Drs. Koval and Mavian, and that Dr. Bethoux could not offer an opinion regarding plaintiff's ability to perform his job because he had not recently examined plaintiff. R. 417. On May 20, 2004, plaintiff's employment was terminated due to his failure to return to work on that date. R. 66.

On July 5, 2004, MetLife received a brief letter from Dr. Bethoux dated June 18, 2004. R. 67, 466. In that letter, Dr. Bethoux stated that he saw plaintiff on May 4, 2004, and that plaintiff reported neck pain and severe fatigue. Dr. Bethoux stated that the "MRI showed structural changes of the spine, most likely creating the neck pain." He further stated that plaintiff's fatigue "has been persistent and his endurance is decreased despite trials of medication. This combination of severe neck pain and fatigue has created disability for Mr. Yacobucci and he has been

10

unable to work since the end of March." R. 466.

Dr. Bethoux examined plaintiff again on August 2, 2004. R. 95-97. His notes indicate that plaintiff reported that he was still bothered by severe fatigue and neck pain, but that he exercises daily. He stated that plaintiff was "well appearing, in no acute distress." R. 95. Dr. Bethoux further noted that the examination for multiple sclerosis was "relatively stable," that the examination was "stable overall," and that the major problems were fatigue and cervical pain. R. 96. He recommended a follow-up appointment in one year. The notes of Nurse Marie A. Namey indicate that the follow-up appointment would be in six months. R. 96.

On August 17, 2004, plaintiff underwent a Rehabilitation Services Functional Capacities Evaluation ("FCE") which was completed by Jana Edington, an occupational therapist, and Barbara Suter, a physical therapist. R. 356. Plaintiff reported that he was under no participation restrictions from his physician. The examination revealed that plaintiff ambulated within functional limits with good speed and stability. R. 357. The examination showed some deficiencies in upper body range of motion, and plaintiff fell between the sedentary and light strength ranges for all material handling activities, with the exception of his push/pull abilities, which fell within the medium strength range. The examiners concluded that plaintiff had a good tolerance for frequent sitting and kneeling, a fair tolerance for work above waist level, repetitive reaching forward at waist level, intermittent standing and walking, and squatting, and poor tolerance for static bending and stair climbing. R. 358. The test

11

revealed a slight decrease in fine motor coordination, with plaintiff testing in the fiftieth percentile for his age and gender group. R. 359. The examiners noted that plaintiff declined to participate in work simulation tasks for the relevant job recommendations, claiming that he had a migraine headache. R. 359. They recommended that plaintiff limit his activities to the sedentary to light strength ranges. R. 359.

An employability assessment dated August 25, 2004, was completed by Caroline Wolfe, a rehabilitation counselor at Vocare Services. R. 360. The assessment considered the FCE completed on August 17, 2004, and noted that plaintiff was unable to perform the part of the test most relevant to his occupation because of a migraine. R. 362. Ms. Wolfe also noted that the FCE revealed that plaintiff demonstrated capacities in the sedentary to light strength range during the evaluation. R. 362. Ms. Wolfe concluded that although plaintiff has skills that would allow him to work in a job in the sedentary strength range, the chronic pain caused by the herniated disc in his neck and the erratic symptoms of multiple sclerosis would make his ability to function "erratic and unpredictable." R. 363. She further stated, "The fatigue is constant at this period of time and is the most problematic and disabling part of his constellation of symptoms. He has frequent (4-5 times a year) exacerbations of the MS which cause severe pain, inability to walk, blurry vision, [and] diminished dexterity." R. 363. She concluded that plaintiff's conditions prevented his ability to work even at a job in the sedentary strength range on a consistent and reliable basis, and that he was not employable in any position as a result of those conditions. R. 363.

On August 2, 2004, MetLife requested a copy of Dr. Bethoux's office notes from the May 4, 2004, evaluation.  R. 68.  On September 13, 2004, plaintiff filed an appeal from the May 5th decision denying benefits.  R. 68.  On September 22, 2004, MetLife received a form faxed by Dr. Bethoux.  R. 366.  On this form, Dr. Bethoux states that plaintiff was disabled from his job as a customer service representative as of March 23, 2004, and that he was unable to return to work.  He cited the MRI showing structural changes of the spine, creating neck pain.  He also noted plaintiff's fatigue and interrupted sleep patterns.  He noted that plaintiff did not require assistance in performing his daily activities.  R. 366.  Dr. Bethoux also stated that plaintiff's gait was slightly slowed, that his hip strength was 4/5 bilaterally, and that he had been encouraged to exercise.  R. 367.  On September 29, 2004, MetLife received nine pages of medical information for consideration in the appeal process, including Dr. Bethoux's records of the office visit of August, 2004.  R. 69.

MetLife obtained an Independent Physician Consultant Review by Dr. Valerie Ito, M.D., a physician who is board certified in physical medicine and rehabilitation.  The date of the review is November 2, 2004.  R. 103.  The report was submitted to MetLife on November 10, 2004.  R. 72.  Dr. Ito reviewed and summarized numerous medical records relating to plaintiff's multiple sclerosis, neck and other health problems over the course of several years.  Dr. Ito also spoke with Dr. Bethoux by telephone.  R. 113.  Dr. Bethoux stated that he felt that the combination of cervical spondylosis causing neck pain and the ongoing severity of fatigue related to multiple sclerosis was the cause of plaintiff's

13

ongoing impairment. He stated that there was no significant change in the physical examination or symptoms at the May, 2004 evaluation. Dr. Ito questioned Dr. Bethoux about his note that plaintiff mentioned returning to work the next week, and Dr. Bethoux indicated that if a patient wishes to return to work, he generally does not restrict this, as he feels that patients should do what they are able to do. Re. 113. Dr. Bethoux also recalled that plaintiff came to the August appointment independently. R. 114. Dr. Ito noted that it was a three-hour drive both ways from plaintiff's home to Dr. Bethoux's office. Dr. Bethoux stated that although plaintiff's job was sedentary, he felt that "ongoing work would be difficult" in light of the muscle pain and central nervous system fatigue related to multiple sclerosis. R. 114.

Dr. Ito noted that although plaintiff had a long history of neck pain from 1999, the March, 2004, MRI scan did not document significant change, and that the examinations "are not significant for radicular findings or specific sensory or motor loss that would impact his ability to do sedentary work." R. 114. She noted that both Dr. Koval, plaintiff's primary care physician, and Dr. Mavian declined to indicate that there was a significant work impairment for plaintiff's condition. Dr. Ito indicated that in light of plaintiff's cervical problems, "restrictions in terms of repetitive push/pull activities, lifting greater than 10 pounds, [and] activities requiring extensive neck flexion, extension and rotation would be warranted." R. 114. She also noted that the use of a telephone would require a headset, and that plaintiff should have an ergonomic workstation and be permitted to do postural adjustments while sitting or standing to avoid his neck becoming

14

stiff.  R. 114.  Dr. Ito concluded that as to plaintiff's muscular
sclerosis, "he has not been documented to have [an] ongoing
progression of his neurologic dysfunction in terms of MRI findings
over time."  R. 114.  She noted that his May, 2004, examination
was relatively stable, and that there was a slight decrease in
lower extremity strength at the August, 2004, examination, though
she stated, "I am uncertain whether or not this is effort-related."
R. 114.  In light of plaintiff's symptoms in hot, humid weather and
his intermittent difficulties with balance, she recommended that
exposure to hot, humid environments and working at heights be
restricted.  R. 114.  Dr. Ito concluded that in light of the fact
that plaintiff was able to travel three hours each way to see Dr.
Bethoux, and given "the lack of documentation of progression of his
multiple sclerosis on an objective basis, he should be able to
participate in sedentary work activities that he is motivated to
do."  R. 115.

On December 14, 2004, the denial of disability benefits for
the period from March 30, 2004, through May 20, 2004, was
overturned on appeal by ruling of the BCAC.  R. 80, 442.  In a
letter dated December 15, 2004, plaintiff's counsel was notified
that benefits had been approved for the period from March 30, 2004,
through May 20, 2004, but that if plaintiff was claiming benefits
for any absence after May 20, 2004, he would have to provide the
case manager at MetLife with medical documentation for that period
no later than January 5, 2005.  R. 434.  On December 16, 2004,
MetLife was notified by the BCAC to follow up on the request for
additional medical records on January 5, 2005, and to then schedule
a neurological independent medical evaluation.  R. 80.  On January

10, 2005, MetLife received a letter from plaintiff's counsel dated January 5, 2005, in which he stated that plaintiff wished to claim a continued absence beyond May 20, 2004.  Counsel enclosed Dr. Bethoux's office notes for the examinations of plaintiff on May 4, 2004, and August 2, 2004.  R. 82, 92-97.

An appointment for a neurological examination with Dr. Gerald Steiman was scheduled for plaintiff on February 4, 2005.  R. 84. Plaintiff objected on the basis that Dr. Steiman allegedly had a conflict due to his relationship with MetLife.  Another appointment for an independent medical examination was scheduled for March 3, 2005, with Dr. Robert Thompson, a neurologist.  R. 85.  Dr. Thompson submitted a report of the examination on that date.  R. 136.

Dr. Thompson reported that plaintiff stated that he could work at a sedentary job such as his present job.  R. 137.  Dr. Thompson noted that plaintiff walks independently on flat level surfaces, but that his gait was slightly unsteady, and that he was unable to walk in tandem or on heels due to imbalance.  Plaintiff showed no motor weakness or atrophy.  Dr. Thompson reviewed plaintiff's medical records, including the March, 2004, MRI scan and the report of Dr. Ito.  He concluded that the medical records confirmed Dr. Ito's findings.  R. 138.  He concluded that plaintiff should be able to function at his present job.  R. 138.  Dr. Thompson concluded that there were no objective findings on examination or diagnostic studies that indicated that plaintiff would not be able to function at a sedentary type job such as he had before his absence, but that he would not be able to work at a job which required exposure to heat, walking on uneven surfaces, climbing or

16

repetitive physical labor.  R. 138.  He recommended that plaintiff be on Provigil to combat fatigue.  R. 139.

From March 2, 2005, through March 4, 2005, Omega Insurance Services conducted a video surveillance of plaintiff at the request of MetLife.  R. 376.  On March 2, 2005, plaintiff was observed walking, standing, carrying a briefcase, and entering a vehicle. He moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction.  Plaintiff was observed on March 3, 2005, walking from his residence, driving a vehicle, entering a store and a hospital, pumping gas, carrying a coffee cup and loose papers, looking under the vehicle, standing, kneeling, bending at the waist, turning, and twisting his upper and lower body without showing any external signs of impairment or physical restriction.  On March 4, 2005, plaintiff was observed driving to various stores and was videotaped entering and exiting his vehicle and various stores, opening and closing doors, walking, running, bending at the waist, kneeling, squatting, standing, carrying several small bags, and turning and twisting his upper and lower body.  R. 376.  He moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction.  R. 376-77.

On March 18, 2005, MetLife rendered a decision denying plaintiff's claim for benefits from May 21, 2004, through the date of the decision.  R. 86.  In a letter dated March 21, 2005, MetLife advised plaintiff's counsel of this decision.  R. 385.  Metlife cited §5.10 of the Plan, which provides that an employee is not entitled to benefits if he fails to give proper information respecting his condition.  The letter also referred to the

17

evaluation of Dr. Thompson as a reason for the denial. R. 386. By letter dated April 22, 2005, plaintiff's counsel notified MetLife that plaintiff wished to appeal the denial of disability benefits. The letter stated that the appeal was limited to the time period between May 21, 2004, and August 17, 2004, and that plaintiff was making no claim for disability benefits beyond August 17, 2004. Counsel indicated that plaintiff had no further documentation to provide in support of his claim. R. 384.

On June 21, 2005, the BCAC denied plaintiff's claim for disability benefits from May 21, 2004, through August 17, 2004. In a letter dated June 24, 2005, plaintiff's counsel was notified of that decision. R. 735. The letter referred to §3.1 of the Plan, which provides that disability benefits shall terminate when disability ceases. The letter also noted §3.4 of the Plan, which provides that disability benefits will terminate when the disability ceases, or when the employee no longer follows the requirements of the plan, whichever is earliest. The letter also cited §5.10 of the Plan, which provides that an employee will not be entitled to benefits if he fails to give proper information respecting his condition. The letter stated that "the BCAC reviewed Mr. Yacobucci's complete medical file and concluded that there was no additional objective medical documentation provided to support a continued absence beyond May 20, 2004." R. 736. The letter further stated that plaintiff was notified that he should provide MetLife with additional medical documentation to support his claim by January 5, 2005, and that "[n]o additional medical documentation was received." The BCAC "concluded that there was insufficient medical documentation to support a continued absence."

18

R. 736.

Plaintiff argues that the decision of the BCAC to deny benefits for the period between May 21, 2004, and August 17, 2004, was arbitrary and capricious.[1]  He contends that the burden is on the Plan to show that he was not disabled during that period. However, the Plan provides that the claimant will not be entitled to disability benefits if he "fails to give proper information respecting his condition[.]" Plan §5.1.  The Summary Plan Description requires claimants to "[f]urnish information from the physician who is caring for you satisfactory to the Claims Administrator, to certify your disability, including the nature and frequency of your treatment[.]" R. 43.  The Plan provides for the termination of benefits if the employee no longer follows the requirements of the Plan or if the certified disability ceases. Plan §3.4.  Plaintiff bore the burden of producing sufficient evidence of his disability during the relevant period to satisfy the Plan.  See Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 46 (3d Cir. 1993)(plaintiff bore burden under plan to substantiate claim that physical condition caused total disability by submitting medical evidence to support eligibility for benefits); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 985 (6th Cir. 1991)(rejecting argument that once disability benefits are

---

[1]The court notes that plaintiff's complaint seeks restoration of short-term disability benefits "according to the terms of the Plan from the time they were terminated to the maximum payment period under the Plan[.]" However, plaintiff specifically limited his appeal to the period from May 21, 2004, through August 17, 2004.  He has not exhausted his administrative remedies under the Plan in regard to any claim for benefits beyond August 17, 2004.  Therefore, plaintiff's claim in this case must be limited to the time period which was the subject of his appeal.  See Weiner v. Klais and Co., Inc., 108 F.3d 86, 91 (6th Cir. 1997)(dismissing action for recovery of benefits where plaintiff did not exhaust his administrative remedies under the plan).

conferred, the burden of proof lies with the insurance company to prove that employee can return to former employment).

Plaintiff also argues that it was arbitrary and capricious for the BCAC to conclude that he was not disabled between May 21, 2004, and August 17, 2004, in light of the BCAC's conclusion that he was entitled to disability benefits for the period prior to May 21st. However, a review of plaintiff's medical records indicates that it was not arbitrary or capricious for the BCAC to conclude that proof of disability prior to May 21st did not automatically constitute proof of disability beyond that date.  The medical records indicate that plaintiff's condition was not static.  Dr. Bethoux, plaintiff's treating neurologist, described plaintiff's symptoms as unpredictable and intermittent.  R. 122.  For example, plaintiff's symptoms were described as being affected by the weather or stress.

Plaintiff complained of severe neck pain in March of 2004. However, Dr. Mavian's report of May 18, 2004, indicated that plaintiff's condition had improved with physical therapy and muscle relaxants.  Both Dr. Koval, plaintiff's general physician, and Dr. Mavian refused to certify that plaintiff was disabled at that time. Plaintiff himself stated during his examination by Dr. Bethoux on May 4, 2004, that he was planning on returning to work the next week.

Plaintiff relies on the disability forms and letters submitted by Dr. Bethoux and his nurse.  Aside from the fact that these forms are conclusory in nature, they are arguably inconsistent with Dr. Bethoux's treatment notes.  Dr. Bethoux never specified any restrictions on plaintiff's employment or other activities in his treatment notes.  Dr. Bethoux stated in his treatment notes for

20

May 4, 2004, that plaintiff reported no significant change in his symptoms since the last visit, that plaintiff reported that he had been sleeping better while taking muscle relaxants, and that his neck pain was improved with exercise, and that he was planning on returning to work the next week.  The notes contain no indication that plaintiff was physically unable to return to work.  When asked whether he had responded to plaintiff's comment about returning to work the next week, Dr. Bethoux explained to Dr. Ito that he never discouraged a patient who wanted to return to work from doing so.  Dr. Bethoux noted that when he saw plaintiff on August 2, 2004, plaintiff was well appearing and in no acute distress, and that the examination was relatively stable.  Plaintiff was able to drive himself to the appointment, a three-hour trip both ways from his home.

Plaintiff also notes the August, 2004, FCE and employability assessment.  The FCE does not support plaintiff's position, because the therapists who evaluated plaintiff on August 17, 2004, concluded that plaintiff was capable of performing a job within the sedentary to light strength ranges.  R. 359.  In addition, plaintiff did not complete the portion of the study which would have been most relevant to his job duties.  The portion of the study that he did complete, which included activities not required for his job, such as lifting weights, squatting, kneeling, and stair climbing, was arguably more physically demanding than his job would be.  The employability study referenced the FCE, but despite the conclusion of the therapists who conducted the FCE that plaintiff was capable of working in a sedentary job, the author of the employability study reached the contrary conclusion that

21

plaintiff's conditions prevented his ability to work even at a job in the sedentary strength range on a consistent and reliable basis, and that he was not employable in any position as a result of those conditions.    The author of the employability study was not a medical doctor.    The study is also undercut by the fact that plaintiff in fact returned to work in April of 2005.  It would not be unreasonable to assign this study little weight in the decision-making process.

Plaintiff notes that the decision rendered by MetLife in March of 2005 refers to the decision of Dr. Thompson as support for the decision.  Plaintiff argues that Dr. Thompson's examination is not relevant to the issue of whether plaintiff was disabled between May 21, 2004, and August 17, 2004, and that therefore the denial of benefits was arbitrary and capricious.  At the time this decision was rendered, the period for which plaintiff was claiming disability benefits had not been narrowed to the period between May 21, 2004, and August 17, 2004.  This did not occur until the April 22, 2005, letter from plaintiff's counsel, which specified that time period for purposes of the appeal.  Prior to that time, MetLife could reasonably have been under the impression that plaintiff was seeking disability benefits to the full extent allowed by the Plan, which was a period up to one year.  Therefore, the fact that MetLife cited the March, 2005, examination of Dr. Thompson was not unreasonable.

The decision of the BCAC on appeal does not specifically refer to Dr. Thompson's examination, nor does it refer to the March, 2005, surveillance report.  Even if the BCAC did consider Dr. Thompson's report, that would not have been unreasonable.  Dr.

22

Thompson's report was not limited to his observations or conclusions from his physical examination of the plaintiff in March of 2005. He also reviewed plaintiff's medical records prior to arriving at his conclusion that plaintiff was capable of performing sedentary job duties, and he indicated that he agreed with the findings in Dr. Ito's report. Thus, his opinion was based in part on plaintiff's medical history, including the period between May 21, 2004, and August 17, 2004.

Likewise, the report of Dr. Thompson and the surveillance report are relevant to the extent that they contradict plaintiff's argument that he should be considered disabled during the contested period because the BCAC accepted his claim that he was disabled prior to May 21, 2004. These reports, as well as the fact that plaintiff returned to work on April 4, 2005, illustrate that the severity of plaintiff's conditions tends to fluctuate, and that the fact that plaintiff was unable to work during one period of time is insufficient to warrant a finding or even a presumption of disability for another period.

Plaintiff also argues that the benefits decision should be remanded because the BCAC failed to consider medical records he submitted for the appeal. He quotes from the BCAC's letter of June 25, 2005, which states that plaintiff was notified that he should provide MetLife with additional medical documentation to support his claim by January 5, 2005, and that "[n]o additional medical documentation was received." R. 736. He notes the letter from plaintiff's counsel dated January 5, 2005, in which counsel stated that medical records, which consisted of Dr. Bethoux's office notes for the examinations of plaintiff on May 4, 2004, and August 2,

23

2004, were enclosed. R. 82. However, the record indicates that the Plan had these records prior to that time. R. 69. The office notes in question were summarized at length in Dr. Ito's report of November 2, 2004. R. R. 108. Thus, although counsel did submit medical documentation on January 10, 2005, that documentation was not <u>additional</u> medical documentation which was not previously considered or reviewed by MetLife or the BCAC.

In this case it is possible to offer a reasoned explanation for the Plan's decision based upon the evidence, and the decision was not arbitrary and capricious. <u>McDonald</u>, 347 F.3d at 169. Under the terms of the Plan and the Plan Summary, it was plaintiff's burden to furnish the Plan with sufficient medical documentation to support a finding of disability, and the Plan could reasonably conclude, based on the documents in the administrative record, that plaintiff failed to sustain this burden. As previously noted, both Dr. Koval and Dr. Mavian, plaintiff's treating physicians, declined to state that plaintiff was incapable of performing his job duties. Dr. Ito thoroughly reviewed years of medical records and concluded that plaintiff could perform the functions of his sedentary job. The therapists who conducted the FCE concluded that plaintiff was capable of performing sedentary to light work.

Dr. Bethoux stated on a disability form and in a letter that he thought that plaintiff was disabled, but his treatment notes do not indicate that plaintiff should be placed under any kind of work restriction. Further, any conclusion that plaintiff was disabled would be based in large part on plaintiff's subjective complaints of pain and fatigue. See <u>Brown v. National City Corp.</u>, 166 F.3d

1213 (unreported), 1998 WL 787084 (6th Cir. Oct. 29, 1998)(doctor's opinion, based on plaintiff's subjective complaints of pain, that plaintiff was disabled not objective medical evidence which rendered administrator's decision unfair); Yeager, 88 F.3d at 382 (subjective complaints of fatigue and joint pain did not render administrator's denial of benefits arbitrary and capricious where there was no definite anatomic explanation of plaintiff's symptoms).  In support of the finding of disability, Dr. Bethoux indicated that there were structural changes in plaintiff's spine which could explain plaintiff's neck pain.  However, Dr. Ito concluded in her review of plaintiff's medical records that the MRI in March of 2004 did not document significant change from previous tests.  Further, the issue before the Plan was not just whether plaintiff was experiencing neck pain and fatigue, but whether plaintiff's neck pain and fatigue as of May 21, 2004, were severe enough to render him unable to perform his job duties.  Based on a review of the administrative record, the court concludes that the Plan could reasonably find that plaintiff had failed to satisfy his burden of producing medical documentation sufficient to show such a disability.

The court further concludes that the fact that the Plan is self funded, when weighed with the evidence as a whole, is not sufficient to render the Plan's decision arbitrary and capricious. The fact that the BCAC reversed MetLife's decision to deny benefits for the period between March 30, 2004, and May 20, 2004, and granted plaintiff disability benefits for that period militates against a finding that the Plan was improperly motivated or influenced by its own interests in denying benefits for the later

period.

IV. Conclusion

Upon review of the administrative record, the court concludes that the Plan's determination is rational in light of the Plan's provisions, <u>Yeager</u>, 88 F.3d at 381, and that it is possible to offer a reasoned explanation for the Plan's decision based upon the evidence. The Plan's determination is not arbitrary and capricious. <u>McDonald</u>, 347 F.3d at 169. Accordingly, defendant's motion for judgment on the administrative record (Doc. No. 16) is granted. Plaintiff's motion for judgment on the administrative record (Doc. No. 15) is denied. The clerk shall enter judgment in favor of the defendant.

Date: October 17, 2006          <u>       s\James L. Graham       </u>
                                James L. Graham
                                United States District Judge